1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

SAMUEL M. PIATNITSKY,

10                                    Plaintiff,

11          v.

12    BELINDA STEWART, et al.,

13                                    Defendants.

Case No. 3:17-cv-05486-BHS-TLF

REPORT AND
RECOMMENDATION

Noted for March 15, 2019

14

15          Plaintiff, a prisoner proceeding *pro se* and *in forma pauperis*, brought this 42 U.S.C.

16    § 1983 action alleging violations of his First and Fourteenth Amendment rights and of his rights

17    under the Religious Land Use and Institutionalized Persons Act (RLUIPA). Complaint, Dkt. 3.

18    Defendants—the chaplain, grievance coordinator, and former superintendent of the prison where

19    plaintiff is confined, the Corrections Program Administrator of Washington's Department of

20    Corrections, and the Department of Corrections (DOC) itself—move for summary judgment.

21    Summary Judgment Motion, Dkt. 19. Plaintiff has responded, and defendants filed a reply.

22    Plaintiff Response Brief, Dkt. 51; Reply Brief, Dkt. 57. The undersigned recommends that the

23    motion be granted and the complaint dismissed with prejudice.

24

25

REPORT AND RECOMMENDATION-1

**FACTS**

Plaintiff Samuel Piatnitsky is an inmate at Stafford Creek Corrections Center (SCCC), a DOC prison. Declaration of Samuel Piatnitsky, Dkt. 52, p. 7. Mr. Piatnitsky alleges that defendants' policy of applying criteria to inmate requests for the 2017 Passover meal program (Passover was April 10-18, 2017) deprived him of a set of meals for Passover, against his sincerely held religious beliefs. He alleges defendants violated RLUIPA, his First Amendment right to the free exercise of his religion, and his Fourteenth Amendment rights to equal protection and due process. Complaint, Dkt. 3, pp. 10-11; Declaration of Piatnitsky, Dkt. 52, p. 12. Plaintiff also asserts that defendant Dennis Dahne retaliated against him for bringing grievances, violating his First Amendment right to free expression. Dkt. 3, p. 11.

A.     2017 Passover Program

Plaintiff belongs to the Hasidic sect of Judaism. Dkt. 51, p. 3; Piatnitsky Decl., Dkt. 52, p. 7. Passover is an important part of his religious practice. Piatnitsky Decl., Dkt. 52, pp. 2-4.

Inmates who participate in the Passover meal program at SCCC receive a special menu for eight days in accordance with Jewish tradition. Declaration of Belinda Stewart, Dkt. 24, ¶ 5; Declaration of Brad Simpson, Dkt. 23, ¶ 4 & Exhibit 2.

Previously, DOC allowed any inmate who signed up by the deadline to participate in the Passover meal program. Stewart Decl., Dkt. 24, ¶ 5. *Id.* During 2015-2016, DOC became aware that costs had increased with respect to Passover meals. Stewart Decl., Dkt. 24, ¶ 5.

System-wide, DOC spends $2.44 per inmate meal. Simpson Decl., Dkt. 23, ¶ 3 & Exhibit 1. At SCCC, the average cost is $2.19 per meal. *Id.* Passover meals cost about $6.25 per inmate meal. Simpson Decl., Dkt. 23, ¶ 4 & Exhibit 2. In 2015, 1,176 inmates signed up for Passover meals and the DOC spent $197,950 on those meals. Stewart Decl., Dkt. 24, ¶ 5. In 2016, 1,838 inmates signed up, and the DOC spent $309,666. *Id.*

REPORT AND RECOMMENDATION-2

1       In response to these increasing costs, the DOC developed criteria by which to select those

2   inmates for whom Passover meals would be served in 2017. Stewart Decl., Dkt. 24, ¶ 6 &

3   Exhibit 1. The DOC incorporated recommendations from the Jewish Federation of Greater

4   Seattle for ensuring religious access for Jewish inmates. *Id.* Inmates were required to apply by

5   the deadline and either a) be a current consumer of kosher meals, or b) have demonstrated

6   participation in Jewish, Messianic, Christian, or other religious programming applicable to the

7   Jewish faith in the previous 12 months. *Id.*

8       DOC communicated the new criteria to inmates in a memorandum dated December 22,

9   2016. Stewart Decl., Dkt. 24, ¶ 6 & Exhibit 1. Inmates were told that they would be required to

10  submit a form to show that they met the criteria, and the forms were due by January 13, 2017. *Id.*

11  Under the new criteria, only 561 inmates participated in Passover, and DOC spent $91,227 on

12  those meals. *Id.*, ¶ 7.

13      DOC modified the criteria after Passover in 2017. Inmates who would not fall within the

14  categories identified by the criteria would nevertheless be allowed to submit a written

15  explanation of why their request for Passover meals should be granted. Stewart Decl., Dkt. 24, ¶

16  8 & Exhibit 2. The prison chaplain has discretion to approve or deny these requests. *Id.*

17      Plaintiff filed this lawsuit to challenge DOC's denial of his request for Passover meals in

18  2017. Plaintiff received a kosher diet from January 2011 to April 2016. Stewart Decl., Dkt. 24, ¶

19  9 & Exhibit 3; Piatnitsky Decl., Dkt. 52, p. 6. DOC provided Passover meals to plaintiff in 2014,

20  2015, 2016, and 2018. Stewart Decl., Dkt. 24, ¶ 9. (When plaintiff was at Washington State

21  Penitentiary, staff provided him with Passover meals even though he was not on the list for those

22  meals. Piatnitsky Decl., Dkt. 52, p. 6.)

23

24

25

REPORT AND RECOMMENDATION-3

1    After receiving the criteria for the 2017 Passover program, plaintiff requested to

2    participate. The SCCC chaplain, defendant Gary Wakeman, reviewed plaintiff's records and

3    found that he was not a current kosher meal recipient and in the prior 12 months had not

4    participated in Jewish, Messianic, Christian, or other programming applicable to the Jewish faith.

5    Declaration of Gary Wakeman, Dkt. 25, ¶ 5 & Exhibit 1. Chaplain Wakeman responded to

6    plaintiff that he did not qualify, based on the 2017 Passover criteria. *Id.*

7    In a letter to then-Superintendent Margaret Gilbert dated March 22, 2017, plaintiff

8    requested that he be allowed to participate in Passover. Declaration of Salina Brown, Dkt. 20, ¶ 4

9    & Exhibit 1. Superintendent Gilbert responded in a letter dated April 14, 2017, that Chaplain

10    Wakeman had made an appropriate determination under the guidelines. *Id.*

11    B.    Processing of Plaintiff's Grievances

12    Grievance Program Manager Dale Caldwell described the grievance process in a

13    declaration. Declaration of Dale Caldwell, Dkt. 21 & Exhibits 1 (DOC Offender Grievance

14    Program), 2 (DOC Offender Grievance Program Manual).

15    An interview of the person who has submitted a grievance is a mandatory part of the

16    process. *Id.* The Grievance Program Manual provides that "[if] the offender refuses to be

17    interviewed . . . or to actively participate in such an interview, which includes showing up for the

18    grievance call-out, the grievance or appeal may be administratively withdrawn." Caldwell Decl.,

19    Dkt. 21, ¶ 11 & Exhibit 2.

20    The four steps of the grievance program are:

21    Level 0: After a complaint is received, the Grievance Coordinator attempts informal

22    resolution, seeks additional information, or returns the complaint to the prisoner for rewriting.

23    Caldwell Decl., Dkt. 21, ¶ 9. A complaint returned for rewriting must be re-submitted within five

24    days (or a date set by the grievance coordinator) or it is deemed administratively withdrawn. *Id.*

25

REPORT AND RECOMMENDATION-4

1    There is no appeal from a rewrite requirement. *Id*. If the Grievance Coordinator deems a

2    grievance to be non-grievable, it is returned to the grievant; prisoners may request a review of

3    this determination by the Grievance Program Manager. *Id*.

4          Level I: Accepted grievances are processed and responded to by the local Grievance

5    Coordinator, including interviewing the grievant. *Id*. Grievances considered at this level are

6    those against policies, procedures or other offenders. *Id*.

7          Level II: Inmates may appeal decisions of Level I grievances to Level II, where they are

8    investigated and decided by the prison superintendent. Grievances against staff begin at this

9    level. *Id*.

10          Level III: Level II responses may be appealed to Level III, where they are re-investigated

11    by DOC headquarters staff. *Id*.

12          Plaintiff's unit has a confidential grievance box. Defendant Dahne asserts that he

13    typically gathers grievances from this box twice per week. Declaration of Dennis Dahne, Dkt.

14    22, ¶ 5.

15          On April 5, 2017, Dahne accepted for review plaintiff's grievance of his denial from the

16    Passover program.[1] Caldwell Decl., ¶ 17 & Exhibit 3. Plaintiff met with Dahne, who explained

17

18    _____

19    [1] Plaintiff wrote and filed this grievance on March 6, 2017. Caldwell Decl., Dkt. 21, ¶ 14 & Exhibit 3. It was
     processed on March 9, and plaintiff was placed on the call-out schedule to meet in Dahne's office on March 10 for a
20    "resolution/formalization interview." Dahne Decl., Dkt. 22, ¶ 5. Plaintiff did not appear the interview; he was
     sleeping in his cell. *Id*. Plaintiff states that he was sleeping because he was unfamiliar with the grievance process at
     SCCC and because his sleep schedule was off. Dkt. 52, p. 15. The grievance was administratively withdrawn due to
21    failure to participate; defendants assert that this was done in accordance with the DOC Offender Grievance Program
     manual. Caldwell Decl., Dkt. 21, ¶ 14 & Exhibit 3; Dahne Decl., Dkt. 22, ¶ 5. After speaking with plaintiff,
22    however, Dahne agreed to accept the grievance at Level I on April 5. Caldwell Decl., ¶ 17 & Exhibit 3; Piatnitsky
     Decl., Dkt. 52, p. 15.

23    Plaintiff submitted a second grievance (Grievance Log ID No. 17629186) on March 17, 2017. Caldwell Decl., Dkt.
     21, ¶¶ 15-16 & Exhibit 4. That grievance was not accepted because it concerned the same topic as the first
24    grievance. *Id*.

25

    REPORT AND RECOMMENDATION-5

1  the DOC policy and the criteria for participation. Dahne Decl., Dkt. 22, ¶ 6; Piatnitsky Decl.,

2  Dkt. 52, pp. 15-16. Plaintiff questioned the criteria and asserted his desire to participate in the

3  Passover meals. *Id.* Dahne informed plaintiff that he did not meet the requirements, and Dahne

4  would not be able to reverse the decision denying his grievance. *Id.* Dahne told plaintiff that he

5  had an "uphill battle" in grieving the policy at Level I, because Dahne could not change the

6  policy. Dahne Decl., Dkt. 22, ¶ 7; Piatnitsky Decl., Dkt. 52, p. 16.

7          Dahne responded to plaintiff's grievance on April 7, 2017. Caldwell Decl., ¶ 17 &

8  Exhibit 3. Plaintiff's appeal of that response was dated April 14, 2017. Caldwell Decl., ¶ 18 &

9  Exhibit 3. As discussed below, the parties dispute when plaintiff actually submitted this appeal.

10 Dahne responded on April 21 that the grievance appeal was not accepted because it was not

11 submitted within the required five-day timeframe. *Id.*

12         On April 25, 2017, plaintiff submitted another appeal of the Level I response, stating that

13 he filed his appeal late because the facility was locked down on the day it was due. Caldwell

14 Decl., ¶ 19 & Exhibit 3. Plaintiff submitted a kiosk message the same day, making the same

15 assertion. Dahne Decl., Dkt. 22, ¶ 9 & Exhibit 1. Dahne responded to both and again decided not

16 to accept the prior appeal, because it was untimely. *Id.*; Caldwell Decl., ¶ 19 & Exhibit 3.

17 Plaintiff submitted one more appeal, on May 1, 2017; again, it was not accepted. Caldwell Decl.,

18 ¶ 20 & Exhibit 3.

19                          **STANDARD OF REVIEW**

20         Under Rule 56 of the Federal Rules of Civil Procedure (FRCP), "the court shall grant

21 summary judgment if the movant shows that there is no genuine dispute as to any material fact and

22 the movant is entitled to judgment as a matter of law." A party is required to support its arguments

23 on whether a genuine dispute of material fact exists by:

24

25

REPORT AND RECOMMENDATION-6

1

2

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

3

4

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

5

6

FRCP 56(c)(1). The central issue is "whether the evidence presents a sufficient disagreement to

7

require submission to a jury or whether it is so one-sided that one party must prevail as a matter

8

of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

9

 The moving party bears the initial burden of showing "that there is an absence of

10

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

11

(1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

12

presenting evidence that negates an essential element of the nonmoving party's case, or by

13

establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden at

14

trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

15

 If the moving party meets its initial responsibility, the burden then shifts to the

16

nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus.*

17

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Genuine disputes are those for which

18

the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

19

*Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit

20

under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute.

21

*Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in

22

the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.*

23

*Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

24

25

REPORT AND RECOMMENDATION-7

1    In ruling on a motion for summary judgment, the Court must draw all reasonable

2    inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and

3    may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 255; *see*

4    *also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court cannot

5    disregard evidence at the summary judgment stage solely based on its self-serving nature, even if

6    it is uncorroborated).

7    To sustain a cause of action under 42 U.S.C. §1983, a plaintiff must show (i) that he

8    suffered a violation of rights protected by the Constitution or created by federal statute, and (ii)

9    that the violation was proximately caused by a person acting under color of state law. *See*

10    *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

11    satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

12    another's affirmative act, or omitted to perform an act which he was legally required to do that

13    caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

14    (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

15    **DISCUSSION**

16    A.    Exhaustion

17    Defendants assert that the Court should dismiss with prejudice because plaintiff failed to

18    exhaust any of his claims.

19    The Prison Litigation Reform Act (PLRA) requires that plaintiff exhaust administrative

20    remedies before filing a complaint in federal court. The relevant portion of the PLRA states: "No

21    action shall be brought with respect to prison conditions under section 1983 of this title, or any

22    other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

23    such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion

24    is required for any suit challenging prison conditions, not just for suits under § 1983. 42 U.S.C. §

25

REPORT AND RECOMMENDATION-8

1    1997e(h); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Exhaustion is mandatory and "cannot be

2    waived, even when the process is futile or inadequate." *Porter*, 534 U.S. at 524.

3          Exhaustion must be "proper," meaning that it "demands compliance with an agency's

4    deadlines and other critical procedural rules because no adjudicative system can function

5    effectively without imposing some orderly structure on the course of its proceedings." *Woodford*

6    *v. Ngo*, 548 U.S. 81, 90-91 (2006).

7          Failure to exhaust is an affirmative defense, so the defendant has the burden of proof.

8    *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014). The defense is properly brought in a

9    summary judgment motion. *Id.* Once the defendant proves that an administrative remedy was

10   available and the offender failed to exhaust that remedy, the burden shifts to the plaintiff. The

11   plaintiff must show there was something about his particular claim which made the "existing and

12   generally available administrative remedies effectively unavailable to him." *Williams v. Paramo*,

13   775 F.3d 1182, 1191 (9th Cir. 2015).

14         Summary judgment is appropriate if the undisputed evidence, viewed in the light most

15   favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; FRCP 56(a). "[I]f

16   material facts are disputed, summary judgment should be denied, and the district judge rather

17   than a jury should determine the facts." *Albino*, 747 F.3d at 1166.

18         1.    Exhaustion of RLUIPA Claim and Free Exercise, Equal Protection, and Due
                 Process Claims

19
20         Defendants assert that plaintiff failed to exhaust his RLUIPA claims or his free exercise,

21   equal protection, and due process claims under § 1983. Plaintiff asserts that he did exhaust those

22   claims or, alternatively, the administrative remedies were effectively unavailable to him. Dkt. 51,

23   pp. 25. Because plaintiff has shown a genuine dispute of material fact as to whether he exhausted

24   his claims, the Court should decline to dismiss them on this basis. If the Court declines to grant

25

1  defendants' summary judgment motion on other grounds, then it should hold a preliminary

2  hearing to decide the disputed factual issues regarding exhaustion.

3          An administrative remedy was available to plaintiff. The defendants submitted evidence

4  describing DOC's Offender Grievance Program (OGP), which permits inmates to submit

5  grievances challenging DOC institution policies, rules, and procedures, the application of

6  policies, rules, and procedures, and retaliation by staff for filing grievances. Declaration of Dale

7  N. Caldwell, Dkt. 21, ¶ 5 & Exhibit 2, p. 33. Inmates can also file employee conduct grievances,

8  including grievances alleging retaliation for participating in the OGP. *Id.* Among other remedies,

9  the OGP can lead to officials correcting an objectionable condition in a reasonable time or

10 changing a policy or practice. Caldwell Decl., Dkt. 21, ¶ 8 & Exhibit 2, p. 22.

11         But defendants have not shown that plaintiff failed to exhaust the available remedies. *See*

12 *Williams*, 775 F.3d at 1191. As noted above, to exhaust his remedies, plaintiff needed to follow

13 the rules of the available administrative process. *See Ngo*, 548 U.S. at 90–91. Under DOC

14 policies, inmates have 20 working days from the date of an incident to file a grievance, and "five

15 working days from the time they receive a response to Level I and II grievances to appeal."

16 Caldwell Decl., Dkt. 21, ¶ 10 & Exhibit 2, p. 20. An exception to this filing timeframe is allowed

17 if there is a valid reason for the delay. *Id.*

18         Here, plaintiff filed a grievance on April 5, 2017, regarding his participation in Passover

19 2017. Caldwell Decl., Dkt. 21, ¶ 17 & Exhibit 3. Defendant Dahne then met with plaintiff about

20 the grievance, explaining that plaintiff did not meet the requirements for participation. Dahne

21 Decl., Dkt. 22, ¶ 6; Piatnitsky Decl., Dkt. 52, pp. 15-16. Dahne provided a Level I response to

22 plaintiff's grievance on April 7. Caldwell Decl., Dkt. 21, ¶ 17 & Exhibit 3. Plaintiff then filed an

23

24

25

REPORT AND RECOMMENDATION-10

1    appeal of the Level I response, which was dated April 14, 2017, the fifth working day after April

2    7.

3              The parties dispute the date plaintiff actually filed his grievance. Defendant Dahne states

4    that he normally collects grievances from the box in plaintiff's unit twice per week. Dahne Decl.,

5    Dkt. 22, ¶ 5. He states that in this instance he did so on April 18. *Id.*, ¶ 8. He states that plaintiff's

6    appeal was not in the box on that date. *Id.* Instead, he found plaintiff's appeal when he checked

7    the box on April 21. *Id.* In another Level I appeal, filed on April 25, plaintiff stated his appeal

8    was late because of the facility lockdown. Caldwell Decl., Dkt. 21, ¶ 19 & Exhibit 3. Dahne

9    again declined the appeal, writing:

10              As stated, you [sic] grievance was signed 4/14. The unit came off lockdown on
                4/16 but you did not submit your appeal until after 4/18 because I picked up
11              grievances on 4/18 and your grievance appeal was not received until the next time
                I picked up on 4/21. If, as stated, your appeal was written on 4/14 there is no
12              reason for your failure to place in in [sic] the box on time.

13    Caldwell Declaration, Dkt. 21, ¶ 19 & Exhibit 3. Plaintiff made the same assertion in a kiosk

14    message on April 25, and Dahne made substantially the same response the next day. Dahne

15    Decl., Dkt. 22, ¶ 9 & Exhibit 1.

16              Defendants assert that because plaintiff had access to the grievance box on April 16,

17    plaintiff could have placed his appeal in the box on April 16 and it would have been accepted.

18    Dkt. 57, p. 2. Because plaintiff did not do so, defendants assert, Dahne treated the grievance as

19    untimely and therefore "not accepted." Caldwell Decl., Dkt. 21, ¶ 18 & Exhibit 3; Dahne Decl.,

20    Dkt. 22, ¶ 8.

21              In response, plaintiff contends that he turned his grievance in on April 15, 2017, at 5:25

22    P.M. Dkt. 51, p. 28; Piatnitsky Decl., Dkt. 52, p. 14. He also submits declarations from two

23    inmates, who indicate plaintiff placed his grievance in the box on April 16. *See* Declaration of

24

25

REPORT AND RECOMMENDATION-11

1  Justin Garrett, Dkt. 55 (fellow inmate states he watched Piatnitsky place a grievance in the box

2  "the first day we got off of the lock down on to what they call partial lock down"—or April 16);

3  Declaration of Peter J. McDaniels, Dkt. 54 (fellow inmate states that Piatnitsky told him he

4  turned his grievance in the first day on partial lockdown—also April 16). Plaintiff asserts that

5  Dahne is incorrect that plaintiff's appeal was not in the grievance box on April 18. Dkt. 51, p. 28;

6  Piatnitsky Decl., Dkt. 52, p. 14.

7        Defendants reply that inconsistencies in plaintiff's statements about when he turned in his

8  appeal should preclude the Court from relying on those statements at summary judgment.

9  Defendants are correct that, as noted above, the declarations from other inmates indicate that he

10  submitted his appeal on April 16, whereas he asserts he submitted it on April 15. But defendants

11  concede that an appeal filed on either date would have been accepted as timely because of the

12  lockdown. Reply Brief, Dkt. 57, p. 2; *see* Dahne Decl., Dkt. 22, ¶ 8.

13        Defendants point to plaintiff's statement, in his April 25 appeal, admitting that he turned

14  in his grievance "late" and also contending this should be excused because of the lockdown.

15  Caldwell Decl., Dkt. 21, ¶ 19 & Exhibit 3. But this statement is consistent with plaintiff's

16  assertion that he turned in his grievance on April 15 or 16. The parties agree that an appeal filed

17  on either of those dates would be "late," – it happened after the deadline -- since the fifth

18  working day after the grievance response was April 14; but they also agree that this lateness

19  would be excusable because the lockdown prevented plaintiff from submitting it on April 14 or

20  April 15. *See* Reply Brief, Dkt. 57, p. 2.

21        Plaintiff's evidence is sufficient to create a genuine dispute of material fact regarding

22  whether he submitted his appeal at the earliest opportunity after the lockdown. Defendants

23  concede that if plaintiff had submitted the appeal at that earliest opportunity, it would have been

24

25

REPORT AND RECOMMENDATION-12

1    timely. The Court may not resolve credibility issues and disputes of fact at summary judgment,

2    and thus cannot find as a matter of law that plaintiff and his two witnesses' specific statements

3    were non-credible because of their slight inconsistency and because of Dahne's contradicting

4    declaration. *See Clark v. Carter*, No. C05-5613 FDB, 2006 WL 3448689, at *4 (W.D. Wash.

5    Nov. 27, 2006) (unpublished) (denying summary judgment as to exhaustion where plaintiff

6    presented factual dispute as to whether he sent appeal).

7        If the Court determines that any of plaintiff's claims survive summary judgment, then

8    before proceeding to trial it should hold a preliminary hearing to resolve this factual dispute. The

9    Ninth Circuit has found that, under the PLRA, Congress intended that motions addressing

10   exhaustion, including "disputed factual questions relevant to exhaustion[,] should be decided at

11   the very beginning of the litigation." *Albino*, 747 F.3d at 1171 ("Exhaustion should be decided, if

12   feasible, before reaching the merits of a prisoner's claim."). Thus, if a genuine dispute of

13   material fact precludes summary judgment on exhaustion, the Court has discretion "to decide the

14   disputed facts in an appropriate preliminary proceeding, 'in the same manner a judge rather than

15   a jury decides disputed factual questions relevant to jurisdiction and venue.'" *Gosch v. Idaho*,

16   No. 1:15-CV-00048-BLW, 2016 WL 3248204, at *3 (D. Idaho 2016) (unpublished) (quoting

17   *Albino*, 747 F.3d at 1170-71, and collecting cases).

18       2.    Exhaustion of Retaliation Claim

19       The Court should find that plaintiff failed to exhaust his claim that defendant Dahne

20   retaliated against him.

21       First, defendants have shown that an administrative remedy was available. As part of the

22   Offender Grievance Process described above, inmates may grieve staff retaliation for filing

23   grievances. Caldwell Decl., Dkt. 21, ¶ 5 & Exhibit 2, p. 33. In addition, inmates may file

24   employee conduct grievances, which also apply to staff retaliation for filing grievances. *Id.*

25

REPORT AND RECOMMENDATION-13

(describing employee conduct grievance as "[a] grievance against a specific, identified employee . . . for alleged inappropriate demeanor, language or actions"). And inmates may express complaints about staff behavior responding to grievances when inmates appeal those responses. Caldwell Decl., Dkt. 21, ¶ 7.

Second, defendants have shown that with respect to his claim of retaliation, plaintiff failed to exhaust the available remedy. It is undisputed that plaintiff did not file any grievance relating to alleged retaliation by Dahne. Nor did plaintiff complain about behavior by Dahne when plaintiff appealed Dahne's Level I grievance responses. *See* Caldwell Decl., Dkt. 21, ¶ 25 & Exhibit 3.

Finally, plaintiff has not shown that there was anything about his claim that made the "existing and generally available administrative remedies effectively unavailable to him." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).

Plaintiff alleges the grievance process was not available to him because Dahne's behavior amounted to bullying to prevent plaintiff and other inmates from using that process. He alleges that Dahne "has nurtured a sociocultural institution of stonewalling grievances," and that Dahne's responses to grievances (both plaintiff's and others) constitute "threats." Dkt. 51, p. 42. Plaintiff stated in a declaration that he was afraid to file a grievance because he had heard of other inmates being retaliated against. Piatnitsky Decl., Dkt. 52, p. 16. Plaintiff also submitted a declaration from another inmate stating that plaintiff told him he was afraid to file a grievance against Dahne for retaliation because he feared being transferred, mentioning Dahne's aggressive behavior. McDaniels Decl., Dkt. 54, p. 4.

Regardless of the admissibility of this statement by another inmate, plaintiff fails to allege facts to show that Dahne or any DOC employee threatened or intimidated him to prevent

1   him from filing a grievance. A generalized fear of retaliation cannot excuse plaintiff's failure to

2   exhaust administrative remedies. *See, e.g.*, *Pryor v. Webb*, No. CV 11–8854–VAP PLA, 2013

3   WL 3270870, at *5 (C.D. Cal. 2013) (unpublished) (collecting cases); *Martin v. Evans*, No. C

4   08–04067 JW, 2012 WL 1929885, at *3–4 (N.D. Cal. 2012) (unpublished) (holding that

5   plaintiff's "professed fear of further retaliation" did not excuse failure to exhaust). Defendant

6   Dahne's responses to plaintiff's grievances are not severe; even when interpreting these

7   responses in the light most favorable to the plaintiff, these responses constitute a reasonable

8   articulation of DOC's policies. *See* Piatnitsky Decl., Dkt. 52, pp. 15-16. Plaintiff's

9   characterizations of Dahne's manner (as "furious," "annoyed," and having a "nasty attitude"),

10  and his and other inmates' general fear of being transferred if they submit a grievance to

11  challenge Dahne's behavior, are insufficient to create a genuine factual dispute.

12      Plaintiff also relies on a Second Circuit decision finding that retaliation was not a "prison

13  condition" and thus that the PLRA did not require plaintiff to file a grievance to exhaust his

14  retaliation claim. Dkt. 51, p. 42; *see Lawrence v. Goord*, 238 F.3d 182 (2d Cir. 2001), *cert.*

15  *granted, judgment vacated*, 535 U.S. 901 (2002). As defendants point out, that opinion was

16  vacated by the Supreme Court and superseded by another Second Circuit opinion, which held

17  that exhaustion was indeed required. *Lawrence v. Goord*, 304 F.3d 198 (2d Cir. 2002). More

18  importantly, this second opinion reflects the law in the Ninth Circuit. *See Grenning v. Klemme*,

19  34 F. Supp. 3d 1144, 1162 (E.D. Wash. 2014).

20      Accordingly, the Court should dismiss plaintiff's First Amendment retaliation claim for

21  failure to exhaust administrative remedies. *See* 42 U.S.C. § 1997e(a).

1

2

B.    The RLUIPA Claim is Moot Because Plaintiff Has Already Received the Relief He
Seeks.

3

4

Injunctive relief is available under RLUIPA, but damages are not. *Wood v. Yordy*, 753

F.3d 899, 904 (9th Cir. 2014); *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1113 (9th Cir.

2010).

5

6

A federal court's jurisdiction depends on the existence of a live case or controversy.

*Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996). If an issue in a case is no longer in dispute,

7

8

or a party receives the requested relief, then the issue may be moot. *Alvarez v. Hill*, 667 F.3d

1061, 1063-64 (9th Cir. 2012) ("A claim is moot 'when the issues presented are no longer live or

9

the parties lack a legally cognizable interest in the outcome.'").

10

11

A court may review a claim that is moot if it implicates a practice that is "capable of

repetition yet evading review." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1287

12

13

(9th Cir. 2013). In such cases, "there must be a reasonable likelihood that the same party will be

subject to the action again,'" and the "'duration of the challenged action or injury must be too

14

short to be fully litigated.'" *Id.* (quoting *NAACP, W. Region v. City of Richmond*, 743 F.2d 1346,

15

1353 (9th Cir. 1984)). "Absent a sufficient likelihood that he will again be wronged in a similar

16

17

way, [a plaintiff] is no more entitled to an injunction that any other citizen." *City of Los Angeles
v. Lyons*, 461 U.S. 95, 111 (1983).

18

19

Here, plaintiff received a Passover meal in 2018. Piatnitsky Decl., Dkt. 52, p. 10. In

addition, under the current DOC policy for prisoners requesting Passover meals, a prisoner who

20

does not satisfy the specified criteria may submit a written statement of reasons for the request

21

and explain why they should be allowed Passover meals. Stewart Decl., Dkt. 24, ¶ 8 & Exhibit 2,

22

23

p. 6. The chaplain has discretion to grant or deny such requests. *Id.* Plaintiff has received, as a

result of the current DOC policy, the injunctive relief he is seeking. *See* Complaint, Dkt. 3, p. 11.

24

25

1    The exception to the mootness doctrine for claims capable of repetition yet evading

2    review is not applicable here, because plaintiff makes no showing that he meets this narrow

3    exception. *See City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983); *Smith v. Hundley*, 190 F.3d 852,

4    855 (8th Cir. 1999). Plaintiff asserts that his claim is not moot "because there is no proof that

5    [defendant] Stewart (or an incumbent) will not whimsically change the quasi-policy in the

6    future." Dkt. 51, p. 46. This speculation is not sufficient to show a "reasonable expectation" that

7    plaintiff will be denied a Passover meal again or that the DOC will reinstate the prior policy. Nor

8    has plaintiff shown that his past injury is of the type "inherently limited in duration such that it is

9    likely always to become moot before federal court litigation is completed." *See Native Village of*

10   *Noatak v. Blatchford*, 38 F.3d 1505, 1509-10 (9th Cir. 1994).

11   Accordingly, the Court should find that plaintiff's RLUIPA claim is moot and dismiss it

12   on that basis.[2]

13   C.    Section 1983 Claims

14   In addition to his separate claim under RLUIPA, plaintiff asserts that defendants are

15   liable under 42 U.S.C. § 1983 for damages, injunctive relief, and declaratory judgment,

16

17

18   [2] While defendants do not cite it, RLUIPA also contains a "safe harbor provision" that functions as a statutory mootness provision. It states,

19   A government may avoid the preemptive force of any provision of this chapter by changing the

20   policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

21   42 U.S.C. § 2000cc-3 (e).

22   District courts have generally construed this provision "according to its plain meaning." *Forter v. Geer*, 868 F. Supp. 2d 1091, 1098 (D. Or. 2012), *aff'd*, 536 F. App'x 724 (9th Cir. 2013); *see also Monson v. Steward*, No. 2:15-

23   CV-00513-PK, 2017 WL 2882709, at *6 (D. Or. July 6, 2017) (unpublished); *Bilal v. Lehman*, No. C04-2507 JLR, 2006 WL 3626808, at *4 (W.D. Wash. 2006) (holding that decision to provide a Muslim inmate with halal meals

24   eliminated substantial burden on his religious exercise and mooted RLUIPA claim)). In addition to the constitutional mootness doctrine discussed above, this provision would also permit defendants to avoid plaintiff's RLUIPA claim.

25   REPORT AND RECOMMENDATION-17

1    regarding violations of his right to free exercise of religion under the First Amendment, his rights

2    to equal protection and due process under the Fourteenth Amendment, and his right to be free

3    from retaliation for protected speech under the First Amendment.

4        1.    First Amendment Free Exercise of Religion

5        The First Amendment guarantees the right to the free exercise of religion, yet this right

6    "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve

7    legitimate correctional goals or to maintain prison security." *O'Lone v. Shabazz*, 482 U.S. 342,

8    348 (1987). The Free Exercise Clause is implicated when prison officials burden the practice of

9    an inmate's religion by preventing him from engaging in conduct that he sincerely believes is

10   consistent with his faith. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008). The First

11   Amendment does not reach the "incidental effects" of otherwise lawful government programs

12   "which may make it more difficult to practice certain religions but which have no tendency to

13   coerce individuals into acting contrary to their religious beliefs." *Lyng v. Northwest Indian*

14   *Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988).

15       A free exercise violation occurs only where a burden imposes more than an

16   inconvenience on religious exercise. *See Warsoldier v. Woodford*, 418 F.3d 989, 995-96 (9th Cir.

17   2005) (substantial burden test is same under First Amendment free exercise clause and

18   RLUIPA). To be considered a "substantial burden," the challenged state action "must impose a

19   significantly great restriction or onus upon [religious] exercise," such that it "intentionally puts

20   significant pressure on inmates . . . to abandon their religious beliefs." *Warsoldier,* 418 F.3d at

21   995-96. The government "must place more than an inconvenience on religious exercise." *Guru*

22   *Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (internal

23   quotation marks omitted). In considering a prisoner's challenge to institutional policies, the

24   Court considers whether the government's conduct "'denies [an important benefit] because of

25

1   conduct mandated by religious belief, thereby putting substantial pressure on an adherent to

2   modify his behavior and to violate his beliefs.'" *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707

3   F.3d 1114, 1124-25 (9th Cir. 2013) (quoting *Warsoldier*, 418 F.3d at 995 (alteration in original)).

4        If plaintiff shows a substantial burden, the next step is to evaluate whether the state's

5   action "is reasonably related to legitimate penological interests," using a four-factor test. *Shakur*,

6   514 F.3d at 884 (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)).

7        Here, plaintiff has created a genuine dispute of material fact as to whether the 2017

8   Passover program criteria substantially burdened his religious practice.

9        Plaintiff has demonstrated that his sincerely held religious beliefs require him to have

10  Passover meals. Piatnitsky Decl., Dkt. 52, pp. 2-4. The 2017 criteria would have permitted

11  plaintiff to qualify for Passover meals if he had participated in related religious programming in

12  the previous year. Stewart Decl., Dkt. 24, ¶ 6 & Exhibit 1. Plaintiff has presented evidence that

13  he belongs to a different religious group (Hasidic Judaism) than others who participate in prison

14  programs that are generally appropriate for those who practice Judaism and that he has sincerely

15  held religious objections to attending those more general programs. *See* Piatnitsky Decl., Dkt. 52,

16  p. 7.

17       The 2017 criteria would also have permitted plaintiff to qualify for Passover meals if he

18  was receiving kosher meals. Stewart Decl., Dkt. 24, ¶ 6 & Exhibit 1. However, plaintiff has

19  submitted evidence that he took himself off the kosher diet because he believed he was not

20  getting enough calories. Piatnitsky Decl., Dkt. 52, p. 13; Garrett Decl., Dkt. 55, p. 1 (inmate

21  states kosher meals are "very skimpy"); *compare Shakur*, 514 F.3d at 878 (holding more facts

22  required to determine if inmate was substantially burdened, where inmate asserted that

23  vegetarian diet, which would otherwise comport with beliefs, exacerbated hernia and caused

24

25

REPORT AND RECOMMENDATION-19

1    excessive gas, "interfer[ing] with the ritual purity required for his Islamic worship") *with*

2    *Sefeldeen v. Alameida*, 238 F. App'x 204, 206 (9th Cir. 2007) (holding against prisoner who

3    "could point to no adverse physical effects directly resulting from the vegetarian meal plan.").

4         In addition, a fact question exists regarding whether, under the 2017 Passover criteria,

5    plaintiff was able to sign up for kosher meals in time to apply to participate in Passover. Plaintiff

6    contends that, after he received the memo with the Passover criteria, "[a]ny attempt to get onto

7    the Kosher diet would have been futile" due to the timing of sign-ups for that diet. Dkt. 51, pp.

8    11-12. The evidence indicates that after inmates received notice of the new criteria on December

9    22, 2016, they had until January 13, 2017, to submit Passover signup forms. Stewart Decl., Dkt.

10   24, ¶ 6 & Exhibit 1. Yet a message from the chaplain to plaintiff indicates that inmates may only

11   begin receiving kosher meals on two dates per year—May 1 and November 1—although they

12   may apply and be approved for kosher meals at any time. Piatnitsky Decl., Dkt. 52, Exhibit J. It

13   is unclear on this evidence whether a prisoner who applied to receive kosher meals between

14   December 22, 2016, and January 13, 2017, but would not receive the meals until May 1, 2017,

15   would be a "current kosher meal participant" and thus satisfy the 2017 Passover criteria. Plaintiff

16   has presented a fact question as to whether it was possible for him to qualify for the Passover

17   celebration by signing up for kosher meals.

18        Thus, plaintiff has created a genuine dispute of material fact as to whether defendants'

19   actions constitute "a substantial burden on the exercise of his religious beliefs." *Warsoldier*, 418

20   F.3d at 994.

21        Further, viewing the evidence in the light most favorable to plaintiff, the *Turner v. Safley*

22   factors weigh in his favor. *See* 482 U.S. 78, 89-90 (1987).

23        The Court considers four factors under *Turner*:

24

25

1

2

3

4

(1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the jail's concerns.

5   *Mauro v. Arpaio*, 188 F.3d 1054, 1058-59 (9th Cir. 1999) (citing *Turner*, 482 U.S. at 89-90).

6   The Court should find that these factors weigh in plaintiff's favor at the summary

7   judgment stage.

8   First, an issue of fact exists as to whether there is a valid, rational connection between the

9   Passover policy as defendants applied it to plaintiff and the legitimate governmental interest

10   defendants put forward to justify it. Defendants presented evidence that Passover meals are

11   nearly three times as expensive to provide as mainline meals. Simpson Decl., Dkt. 23, ¶¶ 3-4 &

12   Exhibit 1. They also showed that money spent on Passover meals increased by over 150 percent

13   from 2015 to 2016, when there were no requirements for inmates who wanted to participate.

14   Stewart Decl., Dkt. 24, ¶ 5. In addition, the state's interest in reducing costs of Passover meals

15   while still providing them to people who practice Judaism is a legitimate governmental interest.

16   *See Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993). Defendants had "a legitimate interest in

17   running a simplified food service, rather than one that gives rise to many administrative

18   difficulties." *Id.*; *see also Resnick v. Adams*, 348 F.3d 763, 769 (9th Cir. 2003) (holding that

19   "orderly administration of a program that allows federal prisons to accommodate the religious

20   dietary needs of thousands of prisoners" is a "legitimate governmental interest").

21   However, plaintiff has shown that his family was willing to pay the cost of his Passover

22   meals. Piatnitsky Decl., Dkt. 52, p. 14 & Exhibit N. Defendants respond that plaintiff is

23   challenging the entire agency-wide policy, and that plaintiff puts forth no "ready alternatives" to

24

25

REPORT AND RECOMMENDATION-21

1    that policy. Dkt. 57, p. 8. But plaintiff does propose the alternative that inmates who are willing

2    to pay for Passover meals be permitted to do so. Defendants have not shown that this would

3    undermine their interest in reducing the costs of providing Passover meals while running an

4    orderly food service. Nor have they shown a rational connection between the DOC's interest in

5    reducing costs and the criteria it instituted for Passover meals as those criteria were applied to

6    plaintiff. Accordingly, the first *Turner* factor weighs in plaintiff's favor at this stage.

7              Under the second factor, the Court asks whether plaintiff has "alternative means by which

8    he can practice his religion" or is "denied all means of religious expression." *Ward*, 1 F.3d at

9    877. In *Ward v. Walsh*, another case in which the plaintiff was "the only Orthodox Jewish

10   prisoner in the institution," the Ninth Circuit found that the second factor weighed in the

11   plaintiff's favor because he did not have access to an Orthodox rabbi and could not congregate

12   with other inmates for prayer and discussion. 1 F.3d 873, 878 (9th Cir. 1993). The court held:

13   "we cannot conclude that the opportunity to engage in private prayer is enough to satisfy the

14   second *Turner* factor as interpreted by *O'Lone*. If it were, the factor would have no meaning at

15   all because an inmate would always be able to pray privately." *Id.* (citing *O'Lone v. Shabazz*, 482

16   U.S. 342, 348 (1987)). In contrast, in *Shakur*, the Ninth Circuit found that the plaintiff had not

17   been denied all means of religious expression because evidence showed that "he could keep a

18   copy of the Qur'an in his cell, along with a prayer rug and up to seven religious items[,] . . . [h]e

19   could receive visits from an imam upon request, and he could participate in the religious

20   observance of Ramadan." 514 F.3d at 886.

21             Here, plaintiff' situation is similar to the plaintiff's in *Ward*: plaintiff states that his

22   orthodox religious practice prevents him from participating in Jewish services at SCCC because

23   of "the high rate of licentious activity" he asserts takes place there, Dkt. 51, p. 10; *see Ward*, 1

24

25

REPORT AND RECOMMENDATION-22

1   F.3d at 878. In addition, SCCC does not have a rabbi. Piatnitsky Decl., Dkt. 52, p. 8; *see Ward*, 1

2   F.3d at 878. Plaintiff has thus presented evidence that, apart from praying and reading in his cell,

3   denial of Passover meals left him with no other means of practicing his religion. Dkt. 51, p. 10.

4   Viewing the facts in the light most favorable to plaintiff, there is an issue of fact as to whether he

5   had access to means of practicing his religion similar to those available to the plaintiff in *Shakur*

6   or was instead "denied all means of religious expression." *See Shakur*, 514 F.3d at 886.

7           Third, a fact issue exists regarding the economic impact of accommodating plaintiff. In

8   *Shakur*, the Ninth Circuit found that the institutional defendant had failed to investigate how

9   much it would cost to provide Muslim inmates with kosher meals, and that "there is no

10  indication that other Muslim prisoners would demand kosher meals if Shakur's request were

11  granted." *Shakur*, 514 F.3d at 887. Here, defendants present calculations showing the costs of

12  providing Passover meals in different years under different criteria. Stewart Decl., Dkt. 24, ¶ 5.

13  But they do not provide evidence regarding the impact that accommodating plaintiff's specific

14  request—to be able to participate in Passover if his family pays for his meals—on prison

15  resources, or the impact of accommodating similar requests. As in *Shakur*, the record here lacks

16  sufficient evidence to find in the defendants' favor on the third factor.

17          Finally, a fact question exists as to whether there are ready alternatives to the DOC

18  policy. Plaintiff does not propose criteria under which defendants could provide Passover meals

19  to Jewish inmates and only Jewish inmates, as he contends they should do. *See* Dkt. 51, p. 15.

20  Nonetheless, plaintiff has shown that his family would pay for his Passover meals if defendants

21  allowed it. Piatnitsky Decl., Dkt. 52, p. 14 & Exhibit N. He asserts that defendants could

22  implement such a policy for other inmates, and in fact have permitted other inmates and their

23  families to pay for food. Dkt. 51, p. 4. Defendants present no evidence that such a policy would

24

25

REPORT AND RECOMMENDATION-23

1    undermine their administrative and penological interests. Plaintiff thus proposes the "ready

2    alternative" that inmates be permitted to pay for their own Passover meals.

3        Accordingly, because issues of fact exist as to each of the four *Turner* factors, the Court

4    should decline to grant summary judgment in defendants' favor with respect to plaintiff's claim

5    that they violated his First Amendment free-exercise rights.

6        2.    Fourteenth Amendment Equal Protection and Due Process

7        Plaintiff has not shown any genuine dispute of material fact as to whether defendants

8    violated his Fourteenth Amendment rights to equal protection or due process.

9        "Prisoners enjoy religious freedom and equal protection of the law subject to restrictions

10    and limitations necessitated by legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d

11    732, 737 (9th Cir. 1997), *overruled on other grounds as recognized in Penwell v. Holtgeerts*, 386

12    F. App'x 665, 667 (9th Cir. 2010) (unpublished). Prison officials, therefore, "must afford an

13    inmate 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded

14    fellow prisoners who adhere to conventional religious precepts.'" *Id.* (citing *Cruz v. Beto*, 405

15    U.S. 319, 322 (1972)).

16        Prison officials need not make identical provisions for different faiths, but rather "must

17    make 'good faith accommodation of the [prisoners'] rights in light of practical considerations."

18    *Id.* A plaintiff must show that the defendant "intentionally acted in a discriminatory manner,"

19    although such intent sometimes may be inferred by the mere fact of different treatment. *Id.*

20    (citing *Sischo-Nownejad v. Merced Comty. College Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991).

21        To demonstrate an equal protection violation, plaintiff "must show that the defendants

22    acted with an intent or purpose to discriminate against the plaintiff based upon membership in a

23    protected class." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir. 1998). To defeat summary

24    judgment, the plaintiff must "produc[e] evidence sufficient to permit a reasonable trier of fact to

25

REPORT AND RECOMMENDATION-24

1    find by a preponderance of the evidence that" the challenged action was motivated by animus

2    against the protected trait. *FDIC v. Henderson,* 940 F.2d 465, 473 (9th Cir. 1991).

3          On the other hand, when defendants' action does not implicate a protected class such as

4    race or religion, a plaintiff may establish a "class of one" equal protection claim by alleging that

5    he has been intentionally treated differently from others similarly situated without any rational

6    basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

7    (per curiam); *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004),

8    *overruled on other grounds by Action Apt. Ass'n v. Santa Monica Rent Control Bd.*, 509 F.3d

9    1020, 1025 (9th Cir. 2007). To "'be considered similarly situated, the class of one challenger and

10   his comparators must be prima facie identical in all relevant respects or directly comparable in

11   all material respects.'" *Warkentine v. Soria*, 152 F. Supp. 3d 1269, 1294 (E.D. Cal. 2016)

12   (quoting *U.S. v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)).

13         Plaintiff first asserts that defendants discriminate against him as an orthodox, Hasidic Jew

14   because of defendants' "careless practice" of requiring inmates who want to participate in

15   Passover to take part in Jewish or Christian services. Dkt. 51, p. 18. He alleges that participating

16   in those services would violate his orthodox beliefs due to the activities of other inmates that

17   attend them. *Id.*

18         Even if supported, plaintiff's argument fails because defendants' allegedly "careless

19   practice" does not meet plaintiff's burden to show discriminatory animus. Plaintiff submitted no

20   evidence that the DOC-wide Passover program was motivated by any discriminatory intent; to

21   the contrary, defendants have shown that it was motivated by legitimate penological interests of

22   resource management and efficiency. Stewart Decl., Dkt. 24, ¶¶ 5-8.

23         Plaintiff also claims an equal protection violation based on his treatment compared to that

24

25

REPORT AND RECOMMENDATION-25

1    of another inmate, "a liberal, Reformed Jewish man." Dkt. 51, p. 18. Plaintiff asserts that another

2    inmate was allowed to participate in Passover—despite initially having the request denied by

3    DOC for failing to meet the 2017 criteria—after he wrote a letter directly to defendant Stewart.

4    Declaration of Michael Benjamin, Dkt. 56. This allegation lacks evidence that defendants

5    intentionally treated plaintiff differently from Benjamin without a rational basis. *See Olech*, 528

6    U.S. at 564. Plaintiff's speculative theories about defendants' motives are not evidence. *See* Dkt.

7    51, pp. 21-22. Plaintiff cannot defeat summary judgment with "unsupported conjecture or

8    conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

9    Moreover, because plaintiff did not write a letter to defendant Stewart as Benjamin did, he and

10   Benjamin are not "similarly situated." *See Warkentine*, 152 F. Supp. 3d at 1294.

11           Plaintiff also includes as part of his equal protection claim a challenge under the

12   Establishment Clause of the First Amendment. Dkt. 51, p. 18; Complaint, Dkt. 3, p. 8. Plaintiff

13   asserts that defendants compel him and other inmates to attend "one or two religious service

14   groups" if they want to participate in Passover. Dkt. 51, p. 18; Dkt. 3, p. 8. Yet under defendants'

15   policy, inmates who signed up for kosher meals were permitted to take part in Passover without

16   attending religious services. Dkt. 24, ¶ 6 & Exhibit 1. Plaintiff's Establishment Clause claim fails

17   for this reason.

18           Finally, plaintiff raises a due-process claim. Complaint, Dkt. 3, pp. 10-11. But he does

19   not address such a claim in his briefing. The Court should find that plaintiff has waived this

20   claim. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e

21   review only issues which are argued specifically and distinctly."); *Lacy v. Cty. of Maricopa*, 631

22   F. Supp. 2d 1183, 1192 n.10 (D. Ariz. 2008) (holding that § 1983 plaintiffs waived claims not

23   addressed in opposing summary judgment).

24

25

REPORT AND RECOMMENDATION-26

1

2      3.      First Amendment Retaliation

       Plaintiff claims that defendant Dahne's treatment of his grievances constitutes retaliation

3      for filing them in the first place. As discussed above, plaintiff did not submit a grievance

4      concerning the alleged retaliation. He failed to exhaust this claim. *See* 42 U.S.C. § 1997e(a);

5      *Booth v. Churner,* 532 U.S. 731, 741 (2001).

6             Even if plaintiff exhausted his retaliation claim, however, that claim would fail.

7             "Prisoners have a First Amendment right to file grievances against prison officials and to

8      be free from retaliation for doing so." *Watison v. Carter,* 668 F.3d 1108, 1114 (9th Cir. 2012).

9      To prevail on a First Amendment retaliation claim, a prisoner must prove that: (1) he or she

10     engaged in conduct protected under the First Amendment; (2) the defendant took adverse action;

11     (3) the adverse action was causally related to the protected conduct; (4) the adverse action had a

12     chilling effect on the prisoner's First Amendment activities; and (5) the adverse action did not

13     advance a legitimate correctional interest. *Watison*, 668 F.3d at 1114–15.

14            Filing prison grievances is protected conduct, yet there is no evidence that Dahne took

15     any adverse action against plaintiff or that such action chilled plaintiff's activities. Plaintiff's

16     assertion that Dahne used "hyper-aggressive tactics" and "fabricated" a grievance response by

17     citing to an inapt DOC policy is not supported. *See* Dkt. 51, p. 44. The record indicates that

18     Dahne enforced established procedures applicable to all offender grievances. *See* Dahne Decl.,

19     Dkt. 22, ¶¶ 5-7, 10. Plaintiff has also submitted no evidence—other than speculative and

20     conclusory assertions—that Dahne was motivated by anything other than applying the grievance

21     program's rules.

22            Finally, Dahne's actions advanced legitimate penological goals. Prison officials have a

23     legitimate penological interest in requiring adherence to an established grievance procedure. *See*

24     *Sapp v. Kimbrell,* 623 F.3d 813 821 (9th Cir. 2010) ("no adjudicative system can function

25

REPORT AND RECOMMENDATION-27

1  effectively without imposing some orderly structure on the course of its proceedings") (quoting

2  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)).

3      Accordingly, if the Court reaches the merits of plaintiff's retaliation claim, it should

4  nonetheless dismiss that claim.

5      4.    Qualified Immunity

6      Defendants assert qualified immunity for all claims for damages in this matter. The Court

7  should hold that, with respect to plaintiff's First Amendment free-exercise claim—the only

8  damages claim that would otherwise survive summary judgment—defendants are entitled to

9  qualified immunity.

10     Qualified immunity is an affirmative defense to damages liability and does not bar

11  actions for declaratory or injunctive relief. *American Fire, Theft & Collision Managers, Inc. v.*

12  *Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991). To defeat defendants' assertion of qualified

13  immunity, the plaintiff must establish both: (1) that defendants violated a statutory or

14  constitutional right; and (2) the "'right was clearly established at the time of the alleged

15  misconduct.'" *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (quoting *Taylor v.*

16  *Barkes*, 135 S. Ct. 2042, 2044 (2015)). The Court may consider either step first. *Pearson v.*

17  *Callahan,* 555 U.S. 223, 236 (2009).

18     "To be clearly established, a legal principle must have a sufficiently clear foundation in

19  then-existing precedent. The rule must be 'settled law,' . . . which means it is dictated by

20  'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *D.C. v. Wesby*,

21  138 S. Ct. 577, 589-90 (2018) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and *Ashcroft*

22  *v. al–Kidd*, 563 U.S. 731, 741-42 (2011)) (internal quotation marks omitted). As the Supreme

23  Court recently emphasized, "[i]t is not enough that the rule is suggested by then-existing

24

25

REPORT AND RECOMMENDATION-28

1    precedent. The precedent must be clear enough that every reasonable official would interpret it to

2    establish the particular rule the plaintiff seeks to apply." *Id.*

3        The Supreme Court "has 'repeatedly told courts . . . not to define clearly established law

4    at a high level of generality.'" *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *City and*

5    *County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775-76 (2015)). Although a case need not

6    be directly on point, "'existing precedent must have placed the statutory or constitutional

7    question beyond debate.'" *Kisela*, 138 S.Ct. at 1152 (quoting *White v. Pauly*, 137 S.Ct. 548, 551

8    (2017) (per curiam)). A rule is too general if "the unlawfulness of the officer's conduct 'does not

9    follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S.

10   Ct. at 589 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987)).

11       Moreover, the settled legal principle must "clearly prohibit the officer's conduct in the

12   particular circumstances before him." *Wesby*, 138 S. Ct. at 590. Courts are to apply "'a high

13   degree of specificity'" to determine whether it would have been "'clear to a reasonable officer

14   that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533

15   U.S. 194, 202 (2011), and *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015)).

16       Relevant to this case, "settled law" under the First Amendment free-exercise clause

17   requires prison authorities to allow inmates to practice their religion. *O'Lone*, 482 U.S. at 348.

18   Prison authorities must also, according to settled law, provide meals that are nutritionally

19   adequate and meet the dietary laws of inmates' religions. *Ward v. Walsh*, 1 F.3d 873, 877 (9th

20   Cir. 1993); *Shakur*, 514 F.3d at 884. And it is also settled law that these rights are "necessarily

21   limited by the fact of incarceration, and may be curtailed in order to achieve legitimate

22   correctional goals or to maintain prison security." *O'Lone*, 482 U.S. at 348. As discussed above,

23   courts use the four-factor test from *Turner v. Safley*, 482 U.S. 78, 89 (1987), to determine

24

25

REPORT AND RECOMMENDATION-29

1    whether a prison regulation that impinges on constitutional rights is "reasonably related to

2    legitimate penological interests" and therefore valid. *Ward*, 1 F.3d at 876 (internal quotation

3    marks omitted); *see Shakur*, 514 F.3d at 884.

4          In *O'Lone* the Supreme Court found that the prison's constitutional obligation to

5    accommodate the plaintiffs' religious practices needed to be balanced against its legitimate

6    penological and administrative interests. 482 U.S. at 348-49. The prison had a regulation that

7    prohibited prisoners assigned to outside work details from returning to the prison during the day

8    except in emergencies; this resulted in the plaintiffs' "inability to attend Jumu'ah, a weekly

9    Muslim congregational service regularly held in the main prison building and in a separate

10    facility known as 'the Farm.'" *Id.* at 346-47. By applying the four factors from *Turner*, the Court

11    held that the prison authorities had not violated the plaintiffs' free-exercise rights because the

12    challenged policies were related to legitimate security and rehabilitative concerns, the plaintiffs

13    had alternative means of practicing their faith, and the alternative of placing Muslim prisoners

14    into work groups to enable them to attend the services would have an adverse impact. *Id.* at 350-

15    53. The Court added that it would refuse "to 'substitute our judgment on . . . difficult and

16    sensitive matters of institutional administration,' . . . for the determinations of those charged with

17    the formidable task of running a prison." *Id.* at 353 (quoting *Block v. Rutherford*, 468 U.S. 576,

18    588 (1984)).

19          In *Ward v. Walsh*, the Ninth Circuit held that more fact finding was necessary before the

20    court could determine whether the prison authorities' denial of a "strict kosher diet" for the

21    plaintiff was "reasonably related to the prison's legitimate interest in streamlined food service." 1

22    F.3d 873, 879 (9th Cir. 1993). The court reiterated that "'[i]nmates . . . have the right to be

23    provided with food sufficient to sustain them in good health that satisfies the dietary laws of their

24

25

REPORT AND RECOMMENDATION-30

1    religion.'" *Id.* at 877 (quoting *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)). In the case

2    before it, the plaintiff argued that the prison was required "to provide a strict kosher diet at the

3    prison's expense 'that is certified or deemed religiously acceptable by an outside independent

4    Orthodox Jewish Organization . . . at the time the food is physically served to Orthodox Jewish

5    inmates.'" *Id.* at 877. This diet "would require the prison not only to provide kosher food, but to

6    store and to prepare the food in a special manner," and the plaintiff requested "that the food be

7    served in an 'eating area [that is] kept kosher for all Jewish inmates.'" *Id.* The court held that the

8    district court had not made sufficient factual findings as to the second, third or fourth *Turner*

9    factors to allow the court to determine whether defendants' actions were constitutional. *Id.* at

10   879.

11        And in *Shakur v. Schriro*, the Ninth Circuit held that more fact finding was necessary to

12   determine whether a prison's dietary policies substantially burdened the plaintiff's practice of

13   Islam. 514 F.3d 878 (9th Cir. 2008). The plaintiff wanted a diet that comported with his religious

14   beliefs, which prohibited certain foods in the standard diet. *Id.* at 881-82. The vegetarian diet was

15   available to him and would comport with his beliefs; however, he asserted that that diet

16   exacerbated a hernia and caused excessive gas, "interfer[ing] with the ritual purity required for

17   his Islamic worship." *Id.* at 888. He wanted a kosher diet, which would comport with his beliefs

18   and not interfere with his religious practice by affecting his health, but prison policy would not

19   allow him to obtain one. *Id.* at 885. The court found that summary judgment for defendants

20   without applying the *Turner* factors was improper. *Id.* at 885. Applying those factors, the court

21   concluded that "the extent to which Shakur's gastrointestinal problems interfered with his

22   religious activities is a factual issue for the district court." *Id.* The court also found that the Ninth

23   Circuit had not made adequate findings regarding defendants' assertion that providing kosher

24

25

1    meat to Muslim inmates would be too costly. *Id.* at 887. These fact issues made summary

2    judgment inappropriate. *Id.* at 887-88.

3          Here, plaintiff asserts that "his religious claims and his retaliation claims are well

4    established in American law," but he makes no argument that the free-exercise right was clearly

5    established in this context. Dkt. 51, p. 47.

6          Applying a "high degree of specificity," to this case, no settled legal principles "clearly

7    prohibit" defendants' conduct. *See Wesby*, 138 S.Ct. at 590. While the Supreme Court

8    acknowledged a prisoner's right to practice his religion in *O'Lone*, it upheld what it found was a

9    reasonable restriction on that right. *O'Lone*, 482 U.S. at 350. Plaintiff's situation is more similar

10   to that of the plaintiff in *Ward*; Mr. Piatnitsky is, according to his declaration, the only Orthodox

11   Jewish inmate at his facility, and he is seeking a particular type of meal in conformance with his

12   faith. *See Ward*, 1 F.3d at 878. However, the challenged action in this case—denial of

13   participation in Passover in accordance with a new set of criteria—is quite different from that in

14   *Ward*, where the defendants rejected the plaintiff's requests to implement a process for providing

15   strict kosher meals. *See id.*at 877. Moreover, the holding of *Ward* was not that the plaintiff's

16   rights had been violated, but rather that more facts were necessary to make that determination

17   under the *Turner* factors. *Id.* at 879. Likewise, although plaintiff's situation shares some

18   similarities with the plaintiff's in *Shakur*, the Ninth Circuit in that case also found that more facts

19   were needed for the court to complete a *Turner* analysis. *Shakur*, 514 F.3d at 889.

20         Informed by this case law, the undersigned is aware of no precedent—and plaintiff

21   identifies none—that "squarely governs' the facts here." *See Hamby*, 821 F. 3d at 1091 (quoting

22   *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). When viewing the facts in the light most favorable

23   to plaintiff, neither *O'Lone*, *Ward*, nor *Shakur* could have made it clear to a reasonable prison

24

25

REPORT AND RECOMMENDATION-32

1    official that acting as the defendants did in response to plaintiff's requests would be unlawful.

2    Because it was not clearly established at the time of the violation that a policy granting Passover

3    participation for only those inmates who received kosher meals or attended religious services

4    was unconstitutional, or that defendants were required to provide plaintiff with Passover meals

5    regardless of the policy, defendants are entitled to qualified immunity against plaintiff's claims

6    for damages.

7        5.    Requests for Injunctive and Declaratory Relief are Moot

8        In addition to damages for his First Amendment claim, plaintiff also requests declaratory

9    and injunctive relief. The Court should deny those claims as moot.

10        First, plaintiff's claim for injunctive relief under the First Amendment is moot for the

11    same reasons that apply to his RLUIPA claim, discussed above. In short, the DOC has changed

12    the policy that prevented plaintiff from receiving Passover meals in 2017, and plaintiff received

13    those meals in 2018. Plaintiff has thus received the injunctive relief he is seeking in his First

14    Amendment claim. *See* Complaint, Dkt. 3, p. 11. Plaintiff has not shown that the narrow

15    exception for claims "capable of repetition yet evading review" applies here.

16        Plaintiff also requests declaratory relief stating that his rights were violated as he alleges.

17    Dkt. 3, p. 11. In determining whether declaratory judgment is appropriate, the Court asks

18    "whether the facts alleged, under all the circumstances, show that there is a substantial

19    controversy, between parties having adverse legal interests, of sufficient immediacy and reality

20    to warrant the issuance of a declaratory judgment." *Bayer v. Neiman Marcus Group, Inc.*, 861

21    F.3d 853, 868 (9th Cir. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127

22    (2007)). If there is no case or controversy—that is, if the alleged constitutional violations have

23    ceased—then the request for declaratory relief is moot and should be dismissed. *Id.* at 864, 868.

24

25

REPORT AND RECOMMENDATION-33

1    Here, plaintiff's request for declaratory relief is moot for the same reasons his claim for

2    injunctive relief is moot: Plaintiff has been allowed to participate in Passover, and the DOC has

3    changed its policy for reviewing inmate applications to participate in Passover. Accordingly, no

4    substantial controversy exists "of sufficient immediacy and reality to warrant the issuance of a

5    declaratory judgment" on plaintiff's First Amendment claim. *Bayer*, 861 F.3d at 868. The Court

6    should deny plaintiff's requests for declaratory and injunctive relief on that claim.

7                                          **CONCLUSION**

8    Based on the foregoing discussion, plaintiff's claim for injunctive relief under RLUIPA is

9    moot; plaintiff has failed to establish a violation of his rights to equal protection or due process

10   under the Fourteenth Amendment, or that he was retaliated against in violation of the First

11   Amendment; defendants are entitled to qualified immunity against plaintiff's claim for damages

12   for violation of his First Amendment free-exercise right; and plaintiff's requests for injunctive

13   and declaratory relief for a First Amendment free-exercise violation are moot. Accordingly, the

14   undersigned recommends that defendants' motion for summary judgment be granted and

15   plaintiff's complaint dismissed.

16   If the Court adopts this Report and Recommendation, leave to proceed *in forma pauperis*

17   for purposes of appeal may be denied if the appeal is frivolous or taken in bad faith. *Hooker v.*

18   *American Airlines*, 302 F.3d 1091, 1092 (9th Cir. 2002); 28 U.S.C. § 1915(a)(3). The

19   undersigned recommends plaintiff's *in forma pauperis* status continue for purposes of appeal, as

20   at least one of plaintiff's claims was not frivolous and therefore an appeal of the Court's order

21   denying those claims would not be taken in bad faith. *Hooker*, 302 F.3d at 1092.

22   The parties have **fourteen (14) days** from service of this Report and Recommendation to

23   file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b). Failure to file

24   objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474

25

REPORT AND RECOMMENDATION-34

U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration on **March 15, 2019** as noted in the caption.

Dated this 27th day of February, 2019.

Theresa L. Fricke
United States Magistrate Judge

REPORT AND RECOMMENDATION-35